## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PENNEAST PIPELINE COMPANY, LLC,<br>One Meridian Boulevard, Suite 2C01<br>Wyomissing, PA 19610<br><br>       Plaintiff,<br><br> vs.<br><br>A PERMANENT EASEMENT FOR 0.47 ACRES ± AND TEMPORARY EASEMENT FOR 0.80 ACRES ± IN HOLLAND TOWNSHIP, HUNTERDON COUNTY, NEW JERSEY, TAX PARCEL NO. 1015-21-8;<br><br>DAVID AND MARYANN BRIEDE, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., GMAC MORTGAGE CORPORATION;<br><br>AND ALL UNKNOWN OWNERS,<br><br>       Defendants. | CIVIL ACTION<br><br>Docket No. _____<br><br>**Electronically Filed** |

## <u>DECLARATION OF JEFFREY D. ENGLAND</u>

The undersigned, Jeffrey D. England, verifies and states as follows:

1.     I am Manager, Project Management and Construction, UGI Energy Services, LLC, as Project Manager on behalf of PennEast Pipeline Company, LLC ("PennEast") for the PennEast Pipeline Project (the "Project").

2.     This Declaration is submitted for the purpose of setting forth certain facts in support of the Order to Show Cause filed by PennEast for an Order granting PennEast immediate possession of, and the right to enter upon, the Rights of Way on the Property, as defined in the Verified Complaint.  This Declaration shall use the same defined terms as set forth in the Verified Complaint.  The facts set forth below are within my personal knowledge and are true and correct to the best of my knowledge.

3.     I have worked in the natural gas industry for 6 years and have been employed during that time by UGI Energy Services, currently as Manager, Project Management and Construction.  Prior to that, I served as a Captain in the U.S. Air Force and as a Civil Engineer and Explosive Ordnance Disposal Officer from 2004 to 2011.  As a result, I have experience in pipeline design, pipeline operations, pipeline safety regulations, environmental issues relating to pipeline construction and project management.  My duties and responsibilities for PennEast include, among other things, oversight and implementation of the design, permitting and construction for the Project, and the pre-certification acquisition of rights of way.  In connection with the planning of the Project, I am familiar with the Federal Energy

2

Regulatory Commission's ("FERC") requirements for design and construction of interstate natural gas pipelines, with the FERC Order (as defined below), with environmental permitting requirements, with the construction requirements for the Project's pipeline and related facilities and with all aspects of Project scheduling.

## THE PENNEAST PROJECT

4.      PennEast is an interstate natural gas transmission company engaged in the transportation of natural gas in interstate commerce and is comprised of five member companies, to wit, NJR Pipeline Company, SJI Midstream, LLC, Red Oak Enterprise Holdings, Inc., Spectra Energy Partners, LP, and UGI PennEast, LLC. These companies have safely and reliably delivered energy services to Pennsylvania and New Jersey consumers for more than 400 combined years and serve more than three million customers.

5.      The Project is expected to provide about 1 billion cubic feet (Bcf) per day of year-round natural gas transportation service from northern Pennsylvania to markets in New Jersey, eastern and southern Pennsylvania, and surrounding states. It will involve the construction and operation of approximately 120 miles of natural gas pipeline and associated equipment and facilities in Pennsylvania and New Jersey to provide infrastructure for the Project, including, without limitation, a new 36-inch-diameter pipeline extending from Luzerne County, Pennsylvania to Mercer County, New Jersey.

## FERC APPROVAL FOR THE PROJECT

6.      In an order issued by the FERC dated January 19, 2018, Docket No. CP15-558-000, a Certificate of Public Convenience and Necessity (the "FERC Order") was issued to PennEast for the Project.  True and correct copies of the FERC Order are attached as Exhibit B to each Verified Complaint.

7.      The Property identified in each Verified Complaint is located within the corridor approved for the construction, operation, and maintenance of the PennEast pipeline by the FERC Order, based upon alignment sheets that were reviewed and approved by the FERC.

8.      The Rights of Way identified in each of the Verified Complaints are necessary to construct, operate and maintain the new pipeline facilities approved in the FERC Order.

9.      PennEast has entered into precedent agreements with seven foundation shippers and eleven shippers in total, which combined have committed to purchase 975,000 dekatherms per day of the natural gas to be supplied by the Project.  These precedent agreements are based on the Project being in service by certain dates.

10.      It is critically necessary for PennEast to obtain immediate access to the Property identified in each Verified Complaint in order to meet stringent deadlines for on-site survey activities, as more fully described below, which must be

completed on an expedited basis to satisfy certain conditions and deadlines imposed by the FERC Order and ultimately enable construction of the pipeline.

11.    It also is critically necessary for these activities to proceed immediately for PennEast to satisfy the deadlines set forth in the precedent agreements with shippers.

## PENNEAST'S NEGOTIATIONS WITH LANDOWNERS

12.    Since August 2014, PennEast's agents have been continuously meeting with property owners in an attempt to obtain access to the properties along the pipeline route to complete civil and environmental surveys required for the Project.

13.    PennEast's land agent, Western Land Services, contacted Landowners multiple times in an effort to negotiate in good faith for the acquisition of the Rights of Way, or, at a minimum, to secure permission to access the Property identified in the Verified Complaints for survey purposes.

14.    PennEast has obtained permission to conduct surveys on approximately 75 percent of the parcels that are within the pipeline corridor.  However, PennEast has been unable to acquire all the needed rights of way by contract or to obtain an agreement with the Landowners for survey permission on the remaining parcels, including the parcel that is the subject of this action.

15.    The site-specific property survey tasks that PennEast is required to complete for the Project include, without limitation:

    a.    civil surveys, including Right of Way delineation and boundary surveys;

    b.    identification of any adverse site conditions that might impede construction, including constructability reviews;

    c.    delineation of wetlands, waterbodies or other environmentally sensitive areas, followed by post-inspection verification of the survey results by the United States Army Corps of Engineers ("USACE") and the New Jersey Department of Environmental Protection ("NJDEP");

    d.    archeological/architectural investigations, to identify any cultural resources including historical sites and artifacts;

    e.    plant and wildlife surveys, including identification of threatened and endangered animal and plant species;

    f.    geotechnical testing and analysis, to determine subsurface soil, bedrock and groundwater characteristics; and

    g.    other surveys that may become necessary.

16.    Such surveys are performed by PennEast's consultants, engineers and other contractors, whose individual site visits must be coordinated, scheduled and mobilized, and each mobilization increases the cost of the survey significantly, and, in addition, certain surveys can only be conducted during specific windows during the year.

## **FERC-MANDATED ENVIRONMENTAL CONDITIONS**

17.     On April 6, 2017, PennEast submitted an Application for a Freshwater Wetlands Individual Permit and Water Quality Certificate to the New Jersey Department of Environmental Protection Division of Land Use Regulation ("NJDEP"). The NJDEP did not process the Application, in significant part because PennEast has yet to gain access to a significant portion of the proposed Rights of Way in order to perform the survey necessary to complete the Application. A true and correct copy of the NJDEP deficiency letter is attached to my Declaration as Exhibit A.

18.     Access to individual parcels is required for PennEast to survey and collect information needed to complete its Application to the NJDEP for the Permit and Certificate described in the foregoing paragraph and also to comply with each of the Environmental Conditions of the FERC Order set forth in Appendix A to the Order, and to make the required filings with state agencies and the FERC. A true and correct copy of an appendix containing the complete set of Environmental Conditions imposed by the FERC Order is attached to my statement as Exhibit B. The following is a partial summary of certain of those Environmental Conditions, by way of example, for which immediate access to the Properties is needed by PennEast:

a.      Environmental Condition 3 (to train personnel who will implement environmental mitigation measures developed in response to conditions identified, in part, as a result of property inspections).

b.      Environmental Condition 4 (to file any revised detailed survey alignment maps/sheets for all facilities approved by the FERC Order, reflecting new or updated data obtained during site inspections/surveys).

c.      Environmental Condition 6 (to file an Implementation Plan with the FERC for review and approval by the Director of the Office of Energy Projects ["OEP"], including schedules for areas not yet surveyed).

d.      Environmental Condition 10 (to file documentation that PennEast has received all applicable authorizations required under federal law before authorization to commence construction may be issued).

e.      Environmental Condition 15 (to file outstanding portions of the Geohazard Risk Evaluation Report noting any potential soil stability or landslide hazards along the pipeline route, not previously identified due to lack of survey permission).

f.      Environmental Condition 16 (to file a final Karst Mitigation Plan that incorporates the results of all outstanding geophysical and geotechnical field investigations in karst areas, which were not previously completed due to lack of survey permission).

g.      Environmental Condition 17 (to file the results of all other outstanding geotechnical investigations).

h.      Environmental Condition 21 (to complete all necessary surveys to identify water supply wells and groundwater seeps and springs, identify public and private water supply wells within the construction workspace, and file a revised list with the FERC).

i.      Environmental Condition 23 (to file with FERC, for review and approval by the Director of the OEP, a final Well Monitoring Plan).

j.      Environmental Condition 30 (to complete wetlands delineation in accordance with the USACE and applicable NJDEP requirements and file a complete wetland delineation report with the FERC).

k.      Environmental Condition 31 (to complete mapping of all potential vernal habitat to identify areas potentially affected by pipeline construction and operation and provide survey results to the FERC).

l.      Environmental Condition 32 (to finalize a Project-specific Wetland Restoration Plan in consultation with the USACE and NJDEP and file the plan with the FERC).

m.      Environmental Condition 35 (to file a list of locations by milepost where the U.S. Fish and Wildlife Service (USFWS) would require tree clearing restrictions that are specifically applicable to federally listed bats species).

n.      Environmental Condition 39 (to file the results of additional surveys to determine the presence of other state listed threatened and endangered species, and file avoidance and mitigation plans for such species, as necessary).

o.      Environmental Condition 41 (to file information regarding residences in close proximity to the Project, which are located within previously un-surveyed areas, along with site-specific construction plans).

p.      Environmental Conditions 47 and 51 (to file remaining cultural resources survey reports and comments from applicable state agencies).

19.     The tasks described in the Environmental Conditions identified in the preceding paragraphs cannot be carried out until PennEast is granted permission by the Court to possess and enter upon the Rights of Way.

20.     To the extent possible, the surveys will be conducted in sequence along the approved pipeline corridor to maximize efficiency, control costs and minimize delays.

21.     Upon completion of the survey activities, PennEast will also submit all relevant findings and results, as applicable, to the NJDEP to complete PennEast's pending Permit and Certificate Application described in the foregoing paragraph 17, the submission of which will take PennEast at least approximately 30 to 45 days to complete.

22.     The NJDEP has informed PennEast that one hundred percent (100%) of the surveys must be completed before the agency will undertake to complete its review and render decisions on the Permit and Certificate Application.

23.     PennEast must also obtain clearances regarding surveys of any threatened or endangered species from the USFWS and the New Jersey Department of Environmental Protection - Division of Fish and Wildlife

24.     PennEast must also obtain a clearance from the New Jersey State Historic Preservation Office for any archeological/architectural survey findings.

25.     PennEast must complete all filings with the FERC identified in the Environmental Conditions that are required to be made prior to construction before PennEast may receive post-Certificate authorization to proceed with construction of the pipeline.

## CONSTRUCTION TIMING

26.     PennEast's ability to meet the construction deadline of January 1, 2020, set forth in the FERC Order depends to a great extent on PennEast's ability to expeditiously complete the FERC required threatened and endangered species surveys within the narrow survey window of time specified by federal and state agencies.  Indeed, no construction can begin until all surveys are completed and results provided to FERC and the USFWS for review and comment.  As summarized

in the chart below, the mandatory surveys have extremely narrow windows within which they must be completed:

| Species | Survey Window |
|---|---|
| Bog Turtle (Phases 1 and 2) | April 15 to June 15 |
| Timber Rattlesnake (dens) | April 15 to May 15 |
| Indiana Bat | May 15 to August 15 |
| Eastern Small Footed Bat (Phase 2) | June 1 to July 31 |
| Timber Rattlesnake (gestation habitat) | June 1 to September 15 |
| Northeastern Bulrush | June 1 to September 30 |
| Allegheny Woodrat | Spring/Summer (due to requirement that snow cannot be on the ground) |

27.    Any delay in gaining access to properties to complete the required threatened and endangered species surveys will delay the entire Project and make compliance with the January 1, 2020 deadline impossible.  For example, the USFWS directs that specific surveys for bog turtles should only be performed during the period from April 15 to June 15, which coincides with the period of greatest annual turtle activity (spring emergence and breeding) and before vegetation gets too dense to accurately survey.  If PennEast cannot gain access to properties to conduct bog

turtle surveys between April 15 and June 15, 2018, PennEast must wait until April 2019 to complete the surveys, leaving PennEast with seven months or less to submit the surveys to FERC and FWS for review and comment and to complete construction of the entire approximately 120-mile pipeline.  The pre-construction activities and construction activities addressed in this Declaration cannot be completed in seven months.

28.     Similarly, timber rattlesnakes emerge from hibernation from their dens in mid to late April, which is the recommended time to survey for their presence before they may abandon the den area until the fall.  If PennEast cannot gain access to properties to conduct timber rattlesnake den surveys between April 15 and May 15, 2018, PennEast must wait until April 2019 to complete the surveys, leaving it seven months or less to submit the surveys to FERC and USFWS for review and comment and complete construction of the entire approximately 120-mile pipeline.

29.     Thereafter, PennEast will clear and grade the land, install environmental controls, open trenches for the approximately 120-mile pipeline (and install certain segments with boreholes under waterbodies, wetlands and highways), install the pipeline (including stringing, bending, welding and coating of the pipe), pressure test and inspect the pipeline, backfill and restore the surface area, and place the pipeline in service.  If PennEast is unable to complete these activities in an expeditious manner, the project will be delayed causing PennEast irreparable harm

in terms of lost contracts, inability to comply with FERC requirements and other issues.

30.     In order to construct the Project in compliance with the FERC Order, including all the Environmental Conditions in the FERC Order, PennEast must first have immediate possession of all of the Rights of Way sought in this action and the related actions.

31.     PennEast crews and equipment will proceed sequentially along the pipeline route, with each crew following the one ahead of it.  If a crew comes to a property where PennEast has been unable to acquire the necessary Right of Way, then the crew and its equipment must turn around, return to the nearest access point, move around the property where access has been denied to PennEast, and re-commence construction further down the line.  The construction costs and delays associated with re-locating crews and equipment to move around properties where PennEast has been unable to acquire the necessary Right of Way would be substantial, and PennEast's financial loss in this regard could not be recouped.

32.     For the foregoing reasons, PennEast will suffer irreparable harm absent the issuance of an order allowing immediate entry to the Property because delay in accessing the Property will substantially increase the risk that PennEast will be unable to timely complete the construction of the facilities needed for the Project.

33.     The balance of harms favors the issuance of the requested preliminary injunction because the Landowners will be justly compensated for the taking of the Rights of Way on the Property.  Moreover, PennEast is prepared to post security in such amount(s) as the Court may direct to secure the Landowners' recovery of just compensation as well as any damages to the Property incurred as a result of the survey activities described above.

34.     As stated in the FERC Order, the FERC found that the construction and operation of the PennEast Pipeline Project is in the public interest, which will be furthered by allowing the Project to proceed in a timely fashion.

## SECURITY CONCERNS

35.     Through its public outreach efforts, as well as direct contact between various individuals and groups, PennEast has become aware of a number of groups that have organized public opposition to the PennEast Project, including, without limitation, HALT PennEast (www.stoppenneast.org), Stop the Fracking Pipeline Project of Save Carbon County and the Delaware Riverkeepers Network ("DRN"). As Manager, Project Management and Construction for UGI Energy Services, I am ultimately responsible for the monitoring of activities, statements and publications by pipeline opponents in order to timely identify any threatened activity that could delay or impede the PennEast project.

36.    Based on the regular reports that I receive from PennEast's survey crews and land agents, which are maintained in the regular course of business, I am aware that individuals have pulled up PennEast's survey stakes, brandished guns, made threatening references to weapons, and displayed guard dogs such as pit bulls. *See, e.g.,* True and correct copies of Incident Reports #10 (pit bull, threat to "kick my ass"), #19 (mentioned guns), #20 (pulling stakes), #29 (gun brandished), #55 (pit bull), and #68 ("we believe in our guns"), attached as Exhibits C through H.  On one occasion a person mowing a lawn behind a parcel that was being surveyed drove by on a mower and appears to have deliberately shot rocks at the surveyors with the mower.  A true and correct copy of Incident Report #37 is attached as Exhibit I.

37.    Signs containing messages opposing the PennEast pipeline have been observed along roadways on both the Pennsylvania and New Jersey sides of the Delaware River.  The messages include:  "We the People Say No to PennEast," "Don't Let them Poison Our Water! Stop PennEast," "Pipeline Blast Zone, StopPennEast," "Just Say No! Stop PennEast," and "Stop the Fracking Pipelines." K. Mooney, "PennEast Pipeline Backers Tout Lower Energy Prices in Fighting Well-Funded Green Groups," *The Daily Signal*, Oct. 11, 2017.  Based on this level of public and vehement opposition, coupled with my experience and the experience of others involved in the Project, PennEast reasonably expects to encounter efforts

by pipeline opponents to obstruct or otherwise interfere in the survey activities described in Paragraphs 15 and 27 above.

38.     As Manager, Project Management and Construction for UGI Energy Services, I have also reviewed media reports and social media sites to stay informed regarding protest activity on other pipeline projects, including projects in Pennsylvania and New Jersey.  Based upon my review, my experience and my investigation, I have a well-founded concern that individuals and groups who have long voiced their opposition to the PennEast Pipeline Project, and others who may join them, will attempt to imitate actions taken by opponents of other pipeline projects, despite the FERC having approved the Project.

39.     Activists associated with a group called Lancaster Against Pipelines ("LAP") have recruited people to participate in what they have called a "non-violent mass action" against the Williams Partners' Atlantic Sunrise Project by blocking access to pipeline construction space, despite FERC-approval of the project, including the construction space they were blocking.  On October 16, 2017, 25 people were arrested as they tried to block construction in an incident that was publicized in Pennsylvania news media.  A true and correct copy of  "Protesters arrested as pipeline construction begins on natural gas pipeline in Lancaster County," *pennlive.com*, October 16, 2017, is attached as Exhibit J.

40.    The LAP group previously invited such "*nonviolent* direct mass action" on its website at www.wearelancastercounty.org/pledgetoresist and solicited signatures on the following "Pledge to Resist":

> We vow to protect our communities through **nonviolent Civil Disobedience** if FERC gives Williams Gas Company permission to poison our water, clear-cut our forests, steal our farms, bulldoze our Native heritage, and put our families at risk. Along with our financial and material resources, we pledge to put our bodies between the land we love and those seeking to destroy it.

A true and correct copy of a printout of the LAP's website is attached as Exhibit K. LAP likewise has been responsible for "Non-violent Mass Action Training Event" postings on social media. A true and correct copy of the Facebook page advertising the event is attached here as Exhibit L.  According to its website, LAP has established a legal defense fund because "[w]e might need bail."  A true and correct copy of the LAP's website for the LAP Legal Defense Fund is attached here as Exhibit M.  In other words, LAP is dedicated to disrupting the pipeline activities regardless of FERC approval or court findings that Williams has the legal authority for eminent domain.

41.    The prolonged, nationally-publicized public demonstrations at Standing Rock, North Dakota, against the Dakota Access Pipe Line ("DAPL") have provided "inspiration and a blueprint for protests against pipelines in other states." A true and correct copy of Nicholson, "N.D. pipeline fight a blueprint for more protests," www.yorkdispatch.com (AP, April 2, 2017) is attached here as Exhibit N.

18

PennEast pipeline opponents have traveled to North Dakota to join the Standing Rock protests and to develop strategy to block the PennEast pipeline project.  A true and correct copy of D. Scoblionkov, "PennEast Pipeline Protestors Gather With Sioux at Standing Rock," *Huffington Post*, Oct. 27, 2016 is attached here as Exhibit O.  For example, a landowner whose property is on the PennEast pipeline route approved by the FERC wrote the following to PennEast on January 2, 2017:

> If FERC approves this unneeded destruction to the environment, we will continue to do everything in our power to oppose your project.  In October of 2016, I went to North Dakota to join the water protectors in the Standing Rock opposition to the DAPL.  If this [PennEast] pipeline is allowed to move forward, *we will welcome all who want to journey to our farm & teepees will be constructed along the intended route of your destruction*.

A true and correct copy of the landowner's letter is attached here as Exhibit P (emphasis added).

42.    District court judges responsible for eminent domain litigation relating to the Atlantic Sunrise project have included enforcement provisions in the Courts' injunction orders, with the same text that is included in PennEast's proposed order. While PennEast believes that the information summarized above is more than sufficient to justify the inclusion of the enforcement language in this Court's injunction order, PennEast also believes that groups and individuals opposed to the PennEast Pipeline may avoid public disclosure, in advance, of their plans to obstruct and interfere in the project, because they hope that will discourage judges from

entering the protections requested.  It would be needlessly time-consuming and a waste of judicial resources, and cause harmful delay, to require PennEast to wait until an actual incident of obstruction occurs.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

_____

Jeffrey D. England

Dated:  February 6, 2018

213921791v1

20

# Exhibit A




# State of New Jersey
# Department of Environmental Protection
# Division of Land Use Regulation

**Applicant:** PennEast Pipeline Company                    **Date:** 4/26/17
**Address:** One Meridian Blvd. Suite 2c01
Wyomissing, PA 19610

**NJDEP File Number:** 0000-17-0007.2 FWW170001
**Applicant:** PennEast Pipeline Company
**Date Received:** 4/6/17

**Dear Applicant:** The Department is in receipt of your application for a freshwater wetlands individual permit. Upon review of this application package, the Department has determined that all necessary information required to adequately review the application has not been submitted. The information necessary for an administratively complete application is required by N.J.A.C. 7:7A and is summarized by the application checklist for an individual freshwater wetlands permit (last updated February 2015). The application is deficient as noted below.

Please address the deficiencies and submit the requested information within 30 days from the date of this letter so that the Department may commence processing this application. If the requested information is not provided within 60 calendar days from the date of this letter, the Department may administratively close the application. If you have any questions, please contact the Department at (609) 777-0454. The application needs to be completed so that the Department can review the submission, accurately determine if the application meets the rules, and issue the permitting decision.

**Postal Mailing Address:**                         **Street Address (For courier service and hand deliveries only):**
NJDEP Division of Land Use Regulation           NJDEP Division of Land Use Regulation
Mail Code 501-02A                               501 East State Street, Station Plaza Five, 2nd Floor
P.O. Box 420                                    Trenton, NJ  08609
Trenton, NJ  08625

**Please make sure the requested information is submitted to the attention of: Patricia Cluelow, Supervisor ASU**

1.    In accordance with N.J.A.C. 7:7A-10.1(d), an application shall be submitted by the owner of the site which is the subject of the application or by a person who has legal authority to perform the activities proposed in the application on the site, and to carry out all requirements of N.J.A.C.  7:7A et seq.

Furthermore, per N.J.A.C. 7:7A-10.2(b), the application form submitted with the application package shall meet the requirements found within the Freshwater Wetlands Protection Act at N.J.A.C. 7:7A-10.9, specifically:

A permit application shall be signed by the person or persons specified below:

   i.    For a corporation, by a principal executive officer of at least the level of vice president;
   ii.   For a partnership or sole proprietorship, by a general partner or the proprietor, respectively;
   iii.  For a municipality, state, Federal or other public entity, by either a principal executive officer or ranking elected official; or
   iv.   For an entity not covered at (a) 1 through 3 above, all individual owners of record.

Section "B" (Property Owner's Certification) of the standard application form was signed by Michael Mara, a representative of PennEast Pipeline Company, as the owner/easement holder. The Department is uncertain whether Mr. Mara is a vice president or general partner with adequate authority to sign the application.

More importantly, the applicant crossed-out the standard certification and consent to access language and inserted explanatory language stating, in part, that "PennEast hereby certifies that it owns and/or has legal authority over a portion of the right-of-way upon which the proposed work is to be done". The language goes on further to explain that there is an application pending with the Federal Energy Regulatory Commission (FERC) for a Certificate of Public Convenience and Necessity which, upon receipt, will give

the applicant legal authority over the remainder of the right-of-way for the proposed project. Accordingly, the applicant does not yet have the authority to condemn the pipeline easement and accompanying access points.

Based on the information included in Section B of the application form, it is clear the applicant does not yet have legal authority to perform the activities proposed in the application on the site, and to carry out all requirements of N.J.A.C. 7:7A et seq. as required by N.J.A.C. 7:7A-10.1(d) for the full length of the project right-of-way. **Therefore, before this application can be deemed "administratively complete", the applicant needs to submit a revised standard application form which bears the owners' signatures as required pursuant to N.J.A.C. 7:7A-10.2(b) for all the property owners in question.** In lieu of the signatures of the individual owners of record, the applicant may substitute the approved Certificate of Public Convenience and Necessity from FERC that would give the applicant the required legal authority to sign as the anticipated property owner/easement holder.

Even though the FERC certificate would be a milestone that will allow PennEast to sign the application form, as noted above, the application will remain administratively incomplete until the then-current owners provide written consent to access their properties, as the Department will still lack the authority to inspect the subject properties. N.J.A.C. 7:7A-10.2(b)2. The Department needs to inspect the subject properties and adjoining regulated lands in order to verify the accuracy of the wetlands delineation, transition areas, threatened and endangered species habitat, archaeological resources, and best practices to cross particular streams. The lack of accurate resource information would also preclude neighbors and the public from commenting on an accurate submission.

2.    In accordance with N.J.A.C. 7:7A-10.6(a) and as itemized in the application checklist, an application for an individual freshwater wetlands permit shall contain a copy of the deed and/or other relevant documents pertaining to the site, showing property boundaries, ownership, easements, restrictions, previous approvals by any local, federal, interstate or state agency, and any other information relating to the site that will assist the Department in assessing compliance with the Freshwater Wetlands Protection Act rules, N.J.A.C. 7:7A. This information ensures that all required neighboring property owners received notice of the application and that the project does not interfere with existing utility easements. Additionally, easement holders over the project may also hold property interests and be entitled to notice.

This requirement was not addressed in the application submittal. **Therefore, before this application can be deemed administratively complete, the applicant needs to submit the information required to demonstrate compliance with N.J.A.C. 7:7A-10.6(a).**

3.    In accordance with N.J.A.C. 7:7A-10.2(b)6, an application package for a freshwater wetlands permit shall include documentation that the applicable requirements at N.J.A.C. 7:7A-10.8, Public notice requirement for applications, have been met in order for the application to be considered administratively complete.

In accordance with N.J.A.C. 7:7A-10.8 and as summarized in the application checklist for an individual freshwater wetlands permit (item #3), various options are outlined for notification based on the proposed project's type, size and/or scope, as well as the requirements for providing proof demonstrating that the notice requirements have been met.

Upon review of the application package submitted, it appears that the applicant has chosen to notify all owners of land that are located within 200 feet of the proposed disturbance (Option #2 under item 3(B)) and has submitted certified mail receipts as evidence. However, as stated on the checklist, if this option is chosen, the applicant is required to submit a tax map(s) with the location of the proposed disturbance outlined with an area extending 200 feet on all sides of the proposed disturbance outlined so that the Department may verify that all the property owners were noticed. This tax map representation was not submitted. **Therefore, before this application can be deemed administratively complete, the applicant needs to submit the tax map(s) showing the limits of the proposed disturbance with the 200-foot distance outlined accordingly.**

Also, the application checklist for an individual freshwater wetlands permit (item #3(C)) requires that the applicant submit proof that the newspaper notice for an individual freshwater wetlands permit, as required at N.J.A.C. 7:7A-10.8(i)1., is provided. Although the cover letter included with the application states that the proof of newspaper notice could be found in "Attachment D", this proof was not provided in the application package. **Therefore, before this application can be deemed administratively complete,**

the applicant needs to submit a copy of the advertisement, or a copy of an affidavit from the newspaper stating that the advertisement was published.

*Note: If a project site is located in more than one municipality or county, the notice requirements above must be met for each municipality and/or county in which the site is located.*

4.   In accordance with N.J.A.C. 7:7A-10.6(a)2 and as outlined in Item 7 of the checklist for a freshwater wetlands individual permit, an individual freshwater wetlands permit application shall require a line delineation Letter of Interpretation (LOI) issued under N.J.A.C. 7:7A-3.3 (for properties that are one acre or smaller) or verification LOI issued under N.J.A.C. 7:7A-3.4. If no LOI has been issued for the site, the individual permit application shall include all information required for an application for a line delineation LOI or line verification LOI as applicable. The wetlands line shall be shown and labeled on the site plan submitted.

The complete length of the proposed project alignment does not currently have a valid LOI.  The applicant has submitted information for a total of four (4) parcels along the proposed alignment that have valid LOIs and of the four, one of the LOIs is only a presence/absence determination, which is not acceptable per N.J.A.C. 7:7A-10.6(a)2. Upon review of the submitted information, the Department has determined that the applicant has not yet submitted all the information required for a verification type LOI as outlined on the applicable checklist and at N.J.A.C. 7:7A-10.3(d), or a line delineation type LOI per N.J.A.C. 7:7A-3.3. Please note that it does not appear that the wetlands line was field verified and instead is only an approximation of the extent of the wetlands in the alignment.

**Therefore, in order for the Department to conduct a reasonable and accurate review of the wetlands/transition area impacts and deem this application administratively complete, the applicant needs to submit the following for the length of the proposed pipeline alignment:**

    i.   **A proposed delineation of all freshwater wetlands, transition areas, and State open waters on the site, or portion thereof, which is the subject of the application. The delineation shall be clearly marked in the field as required by the application checklist.**
        a.   **When delineating a State open water one to five feet in width measured from top of bank, with no wetland boundary, the delineation shall indicate the centerline of the State open water with several data points numbered and shown on the plans. When delineating a State open water that is greater than five feet in width, the delineation shall include two survey lines, with numbered points, depicting the top of bank on both sides of the State open water;**
    ii.   **Soil borings and/or other physical indicators of the presence or absence of freshwater wetlands, transition areas, and/or State open waters;**
    iii.   **Delineation report information including data sheets and/or other materials that explain and support the delineation for all wetlands within proposed ROW and 150' from each side of ROW;**
    iv.   **The total area, in acres, of wetlands and State open waters on the site before the regulated activity is performed, and the total area, in acres, of wetlands and State open waters, on the site that will remain after the regulated activity is performed. Please note that the measurement of these areas shall be quantified and not estimated as submitted; and**
    v.   **Ten folded copies of a site plan or subdivision map, signed by a licensed surveyor and, where appropriate, a licensed engineer which shows a complete delineation of the wetlands boundary in accordance with the requirements of LOI line verification.**

5.   As required at N.J.A.C. 7:7A-10.2 (b)4 and (b)5 and per item 8 on the checklist for an individual freshwater wetlands permit, ten (10) copies of a detailed project description are required in order for the Division of Land Use Regulation and other divisions/programs within the Department to thoroughly review the proposed project. Only one copy of this report (labeled as Volume #2) was provided in the initial application submittal.

**Therefore, before this application can be deemed administratively complete, the applicant needs to submit nine (9) additional copies of the detailed project description labeled as "Volume 2".**

6.   In accordance with N.J.A.C. 7:7A-12.2(I), all wetland permit applications for proposed projects that may affect properties which are listed, or are eligible for listing, on the New Jersey or National Register of

Historic Places shall require, with the wetlands permit application, the submittal of a Phase IA historical and archaeological survey, and an architectural survey, defined at N.J.A.C. 7:7A-1.4. In addition, per item #26 of the checklist for administrative completeness for an individual freshwater wetlands permit, any project reflecting any of the characteristics at N.J.A.C. 7:7A-12.2(l) shall be deemed to present a high probability of the presence of historic and archaeological resources, requiring assessment, and shall require, with the wetlands permit application, the submittal of a Phase IA historical and archaeological survey, and an architectural survey, defined at N.J.A.C. 7:7A-1.4.

"Attachment Z" of the submitted individual freshwater wetlands permit application contains a "Phase I Archaeological Survey Report" for the proposed project, however, per the abstract contained in this report, the survey "was limited to portions of the study corridor where landowners had granted survey permission", and therefore the "Archaeological survey has only been completed along approximately 14 miles of the proposed centerline in New Jersey". The overall length of the proposed pipeline project within the State of New Jersey is in excess of thirty-seven (37) miles. Thus, the submitted "Phase I Archaeological Survey Report" only provides information for approximately thirty-five percent (35%) of the entire project alignment.

**Therefore, before the Department can deem this application administratively complete, the applicant also needs to submit an amended "Phase I Archaeological Survey Report" which investigates the entire proposed alignment for the PennEast Pipeline Project occurring within the State of New Jersey.**

Should you have any questions or comments, please contact me at (609) 777-0454, Patricia.cluelow@dep.nj.gov or the above address.

Administrative Pre-reviewer: _for_   Patricia Cluelow _____   Signature: _Madlen Aven, PE_
                                                                                   _Assistant Director._

# Exhibit B

## Appendix A

## Environmental Conditions for the PennEast Pipeline Project

As recommended in the final environmental impact statement (EIS) and otherwise amended herein, this authorization includes the following conditions.  The section number in parentheses at the end of a condition corresponds to the section number in which the measure and related resource impact analysis appears in the final EIS.

1.   PennEast Pipeline, LLC (PennEast) shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EIS, unless modified by the order.  PennEast must:

   a.   request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

   b.   justify each modification relative to site-specific conditions;

   c.   explain how that modification provides an equal or greater level of environmental protection than the original measure; and

   receive approval in writing from the Director of the Office of Energy Projects (OEP) **before using that modification**.

2.   The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the order, and take whatever steps are necessary to ensure the protection of all environmental resources during construction and operation of the project.  This authority shall allow:

   a.   the modification of conditions of the order;

   b.   stop-work authority; and

   c.   the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

3.   **Prior to any construction**, PennEast shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, Environmental Inspectors (EIs), and contractor personnel will be informed of the EIs' authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs before becoming involved with construction and restoration activities.

Case 3:18-cv-01585-BRM-DEA   Document 1-6   Filed 02/06/18   Page 28 of 88 PageID: 246

Docket No. CP15-558-000                                        - 85 -

4.    The authorized facility locations shall be as shown in the EIS, as supplemented by filed alignment sheets.  **As soon as they are available**, **and before the start of construction**, PennEast shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the order.  All requests for modifications of environmental conditions of the order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

PennEast's exercise of eminent domain authority granted under the Natural Gas Act (NGA) section 7(h) in any condemnation proceedings related to the order must be consistent with these authorized facilities and locations.  PennEast's right of eminent domain granted under NGA section 7(h) does not authorize it to increase the size of its natural gas facilities to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.    PennEast shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage-yards, new access roads, and other areas that will be used or disturbed and have not been previously identified in filings with the Secretary.  Approval for each of these areas must be explicitly requested in writing.  For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species will be affected, and whether any other environmentally sensitive areas are within or abutting the area.  All areas shall be clearly identified on the maps/sheets/aerial photographs.  Each area must be approved in writing by the Director of the OEP **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the FERC's *Upland Erosion Control, Revegetation, and Maintenance Plan* (Plan) and/or minor field realignments per landowner needs and requirements that do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a.    implementation of cultural resources mitigation measures;

b.    implementation of endangered, threatened, or special concern species mitigation measures;

c.    recommendations by state regulatory authorities; and

d.    agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.    **At least 60 days prior to beginning construction**, PennEast shall file an Implementation Plan with the Secretary for review and written approval by the

Director of the OEP.  PennEast must file revisions to the plan as schedules change. The plan shall identify:

    a.    how PennEast will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EIS, and required by the order;

    b.    how PennEast will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to on-site construction and inspection personnel;

    c.    the number of EIs assigned per spread, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

    d.    company personnel, including EIs and contractors, who will receive copies of the appropriate material;

    e.    the location and dates of the environmental compliance training and instructions PennEast will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change), with the opportunity for OEP staff to participate in the training session(s);

    f.    the company personnel (if known) and specific portion of PennEast's organization having responsibility for compliance;

    g.    the procedures (including use of contract penalties) PennEast will follow if noncompliance occurs; and

    h.    for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

        (i)    the completion of all required surveys and reports;

        (ii)    the environmental compliance training of on-site personnel;

        (iii)    the start of construction; and

        (iv)    the start and completion of restoration.

7.    PennEast shall employ a team of EIs (i.e., two or more or as may be established by the Director of the OEP) per construction spread.  The EIs shall be:

    a.    responsible for monitoring and ensuring compliance with all mitigation measures required by the order and other grants, permits, certificates, or other authorizing documents;

    b.    responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

    c.    empowered to order correction of acts that violate the environmental conditions of the order, and any other authorizing document;

Docket No. CP15-558-000                                   - 87 -

    d.      a full-time position, separate from all other activity inspectors;

    e.      responsible for documenting compliance with the environmental conditions of the order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

    f.      responsible for maintaining status reports.

8.    **Beginning with the filing of its Implementation Plan**, PennEast shall file updated status reports with the Secretary on a **weekly basis** until all construction and restoration activities are complete.  On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

    a.      an update on PennEast's efforts to obtain the necessary federal authorizations;

    b.      the construction status of each spread, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

    c.      a listing of all problems encountered and each instance of noncompliance observed by the EIs during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

    d.      a description of the corrective actions implemented in response to all instances of noncompliance, and their cost;

    e.      the effectiveness of all corrective actions implemented;

    f.      a description of any landowner/resident complaints that may relate to compliance with the requirements of the order, and the measures taken to satisfy their concerns; and

    g.      copies of any correspondence received by PennEast from other federal, state, or local permitting agencies concerning instances of noncompliance, and PennEast's response.

9.    PennEast shall develop and implement an environmental complaint resolution procedure, and file such procedure with the Secretary, for review and approval by the Director of OEP.  The procedure shall provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction of the project and restoration of the right-of-way.  **Prior to construction**, PennEast shall mail the complaint procedures to each landowner whose property will be crossed by the project.

    a.      In its letter to affected landowners, PennEast shall:

        (i)    provide a local contact that the landowners should call first with their concerns; the letter should indicate how soon a landowner should expect a response;

Docket No. CP15-558-000                                      - 88 -

     (ii)     instruct the landowners that if they are not satisfied with the response, they should call PennEast's Hotline; the letter should indicate how soon to expect a response; and

     (iii)    instruct the landowners that if they are still not satisfied with the response from PennEast's Hotline, they should contact the Commission's Landowner Helpline at 877-337-2237 or at LandownerHelp@ferc.gov.

   b.    In addition, PennEast shall include in its weekly status report a copy of a table that contains the following information for each problem/concern:

     (i)     the identity of the caller and date of the call;

     (ii)    the location by milepost and identification number from the authorized alignment sheet(s) of the affected property;

     (iii)   a description of the problem/concern; and

           an explanation of how and when the problem was resolved, will be resolved, or why it has not been resolved.

10.   PennEast must receive written authorization from the Director of OEP **before commencing construction of any project facilities**.  To obtain such authorization, PennEast must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

11.   PennEast must receive written authorization from the Director of the OEP **before placing the project into service**.  Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the project are proceeding satisfactorily.

12.   **Within 30 days of placing the authorized facilities in service**, PennEast shall file an affirmative statement with the Secretary, certified by a senior company official:

   a.    that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

   b.    identifying which of the Certificate conditions PennEast has complied with or will comply with.  This statement shall also identify any areas affected by the project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

13.   **Prior to construction**, PennEast shall file with the Secretary further details on the feasibility of incorporating the Transcontinental Gas Pipe Line (Transco)

Interconnect Alternative site along the CSX Railroad south of MP 111.8R2.  At a minimum, PennEast shall include:

    a.    a map showing the extent of the CSX Railroad right-of-way and Jersey Central Power & Light easement on the east side of the CSX right-of-way, and the CSX Railroad right-of-way adjacent to the Merrill Lynch property;

    b.    a map showing apparently undeveloped parcels adjacent to the Transco right-of-way where the Transco right-of-way crosses the CSX Railroad, and that could potentially be used for the interconnect;

    c.    a map showing wetlands along both the east and west sides of the CSX Railroad;

    d.    records of consultation with Transco regarding feasibility of using the alternative site as the project delivery point to the Transco system; and

    e.    details that support if the interconnect with Transco at the alternative site could meet delivery needs of the project shippers. *(Section 3.4.4)*

14.    **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, an updated report that verifies explosive weights used by the Trap Rock Quarry operator, including concurrence from Trap Rock Quarry that the correct inputs were used.  The results of this study shall be incorporated in the final design of the project. *(Section 4.1.4)*

15.    **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, results of the outstanding Phase 2 and 3 portions of the Geohazard Risk Evaluation Report and include the following in its pipeline design geotechnical report:

    a.    an evaluation of soil stability hazards along the pipeline route at the proposed compressor station site and at locations with above-ground facilities;

    b.    a final landslide hazard inventory;

    c.    any specific measures and locations where PennEast will implement specialized pipeline design to mitigate for potential soil stability or landslide hazards; and

    d.    a post-construction monitoring plan. *(Section 4.1.5.2)*

16.    **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, a final Karst Mitigation Plan that incorporates the results of all outstanding geophysical and geotechnical field investigations in karst areas including stream crossings proposed with the horizontal directional drill (HDD) method.  The final Karst Mitigation Plan shall incorporate all Best Management Practices developed based on the results of the final geophysical and geotechnical field investigations for construction through

karst areas, including any requirements of the Pennsylvania Department of Environmental Protection (PADEP), New Jersey Department of Environmental Protection (NJDEP), and local planning commissions. *(Section 4.1.5.4)*

17.   **Prior to construction**, PennEast shall file with the Secretary the results of its ongoing geotechnical evaluation of working, not active, and abandoned mines near the proposed crossing of the Susquehanna River.  The evaluation shall include final documentation of coordination with the Pennsylvania Bureau of Abandoned Mine Reclamation, along with the results of the geotechnical investigation to confirm the final design.  PennEast shall include this documentation in the Phase 2 and 3 portions of the Geohazard Risk Evaluation Report. *(Section 4.1.5.4)*

18.   **Prior to construction**, PennEast shall file with the Secretary an updated table identifying all areas that may require blasting.  This table shall incorporate the results of the on-going geophysical and geotechnical evaluations. *(Section 4.1.6)*

19.   **Prior to construction,** PennEast shall file with the Secretary the final design plans of each HDD crossing, for review and written approval by the Director of OEP. The final design plans will include the results for all geotechnical borings conducted at each HDD crossing (lithology, standard penetration testing, and bedrock quality designation), and an HDD feasibility assessment based on the soil boring results, including an assessment of the risk for hydrofracturing and inadvertent returns of drilling fluids at each crossing. *(Section 4.1.7)*

20.   **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, an unanticipated discovery plan for paleontological resources.  The discovery plan shall be developed in coordination with the New Jersey Geological and Water Survey and Dr. William Gallagher. The significance of each resource shall be defined in the discovery plan.  This plan shall describe proposed measures to avoid or minimize impacts on significant paleontological resources and include measures that will be implemented in the event of a discovery of paleontological resources during construction.

21.   **Prior to construction**, PennEast shall complete all necessary surveys for water supply wells and groundwater seeps and springs, identify public and private water supply wells within the construction workspace, and file with the Secretary a revised list of water wells and groundwater seeps and springs within 150 feet of any construction workspace (500 feet in areas characterized by karst terrain). *(Section 4.3.1.6)*

22.   **Prior to construction**, PennEast shall identify all septic systems within the construction work space, and file with the Secretary a list of septic systems within 150 feet of any construction workspace.  PennEast shall also file with the Secretary, a plan which describes how PennEast will avoid septic systems, as well as how PennEast will mitigate or restore septic systems to applicable regulatory requirements, for review and approval by the Director of OEP.

23.   **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, a final Well Monitoring Plan that incorporates:

    a.   PennEast's response (Serfes 2016) to U.S. Department of the Interior (DOI) comments;

    b.   an analysis for radon, radium 226, and radium 228 for wells in Hunterdon and Mercer Counties, New Jersey, in accordance with the New Jersey Private Well Testing Act; and

    c.   revisions to section 3.0 of the Well Monitoring Plan to include the types of treatment that PennEast will provide to impacted groundwater users with increased arsenic in groundwater concentrations above the NJDEP established maximum contaminant level (MCL) of 5 microgram per liter ($\mu$g/L), and the U.S. Environmental Protection Agency (EPA) MCL of 10 $\mu$g/L for wells in Pennsylvania, as well as other contaminants detected in post-construction monitoring that are above their respective NJDEP or EPA MCL, and provisions for monitoring and maintenance of any treatment systems PennEast provides to impacted groundwater users. *(Section 4.3.1.6)*

24.   **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, an updated Unanticipated Discovery of Contamination Plan for the project that identifies the management and field environmental professionals responsible for notification for contaminated sites. *(Section 4.3.1.8)*

25.   **Prior to construction**, PennEast shall file with the Secretary the results of the investigations regarding any anticipated blasting near the Swan Creek Reservoir. *(Section 4.3.2.2)*

26.   **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, site-specific crossing plans for all waterbodies with contaminated sediments (see table 4.3.2-5). The crossing method shall ensure that the potential suspension of sediments during construction shall be avoided or minimized to the greatest extent possible to limit any change to the bioavailability of any potential contaminants present. PennEast shall include documentation of consultation with pertinent agencies and identify any recommended minimization measures. *(Section 4.3.2.2)*

27.   **Prior to construction**, PennEast shall file a revised Erosion and Sediment Control Plan (E&SCP) with the Secretary for review and written approval by the Director of the OEP. The revised E&SCP shall:

    a.   include a complete review of waterbody crossings with steep slopes; and

    b.    address waterbody crossing methods for steep embankments and bank stabilization issues, and include site-specific measures to address erosion, sedimentation, and restoration of steep embankments. *(Section 4.3.2.2)*

28.    **Prior to construction**, PennEast shall file with the Secretary its final hydrostatic test plan that identifies the final hydrostatic test water sources and discharge locations, and provides documentation that all necessary permits and approvals have been obtained for withdrawal from each source. PennEast's plan shall provide the approximate water volume that will be withdrawn and discharged as both a project-total amount, and a daily amount, for each pipeline segment. Also, PennEast's plan shall detail the decision process for determining when an alternative water source will be used during exceptional dry periods when low flow conditions may be encountered. *(Section 4.3.2.4)*

29.    **Prior to construction,** PennEast shall file with the Secretary documentation after consulting with appropriate local, state, and federal agencies regarding any in-water timing restrictions which are more restrictive than those required by the Federal Energy Regulatory Commission (FERC) Wetland and Waterbody Construction and Mitigation Procedures (Procedures) (e.g., June 1 through September 30 to protect coldwater fisheries; and June 1 through November 30 to protect coolwater and warmwater fisheries). *(Section 4.3.3.2)*

30.    **Prior to construction**, PennEast shall file with the Secretary a complete wetland delineation report for the entire project that includes all wetlands delineated in accordance with the U.S. Army Corps of Engineers (USACE) and the applicable state agency requirements. *(Section 4.4.1)*

31.    **Prior to construction**, PennEast shall survey all areas mapped as being potential vernal pool habitat and identify if any vernal pool habitat will be affected by project construction and/or operation. The results of these surveys shall be filed with the Secretary and the appropriate state agency(ies) for review. *(Section 4.4.1.2)*

32.    **Prior to construction**, PennEast shall file with the Secretary a final project-specific Wetland Restoration Plan developed in consultation with the USACE and applicable state agencies in Pennsylvania and New Jersey, and file the plan with the Secretary. PennEast shall provide documentation of its consultation with the applicable federal and state agencies. *(Section 4.4.2)*

33.    **Prior to the construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, an Invasive Species Management Plan that includes documentation of consultation with the appropriate state agencies and measures it will implement during construction and operation to minimize the spread of invasive and noxious plant species. *(Section 4.5.1.2)*

34.    **Prior to construction,** PennEast shall file with the Secretary, for review, a Migratory Bird Conservation Plan developed in consultation with the U.S. Fish

and Wildlife Service (FWS), along with documentation of consultation with the FWS. *(Section 4.5.2.3)*

35.  **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, a list of locations by MP where the FWS will require tree clearing restrictions that are specifically applicable to federally listed bat species. *(Section 4.6.1.1)*

36.  PennEast shall incorporate the conservation measures outlined in the FWS' November 29, 2017 Biological Opinion into its implementation plan, including:

    a.  implementing the reasonable and prudent measures;

    b.  abiding by the terms and conditions for the bog turtle;

    c.  adopting the monitoring and reporting requirements;

    d.  consulting with FWS on conservation recommendations for the bog turtle and northern long-eared bat; and

    e.  implementing specific requirements for bulrush as specified in the FWS BO.

    PennEast shall provide FERC and the FWS with all remaining survey results for their review and comment.

37.  **Prior to construction,** if rare flora or fauna are discovered during PennEast's planned surveys of groundwater seeps, PennEast shall develop a plan to avoid or minimize impacts on these species and consult with the FWS.  PennEast shall file with the Secretary documentation of its consultation with the FWS, as well as any recommended measures. *(Section 4.6.1.7)*

38.  **Prior to construction**, PennEast shall consult with the NJDEP regarding timing and activity restrictions that shall be applied within 300 feet of streams that contain wood turtles.  PennEast shall file with the Secretary documentation of this consultation with the NJDEP, as well as any recommendations made by the NJDEP, and whether PennEast agrees to implement these recommendations. Such information regarding this consultation process shall be filed with the Secretary. *(Section 4.6.2.7)*

39.  **Prior to construction**, PennEast shall file with the Secretary a comprehensive list of measures developed in consultation with applicable state wildlife agencies to avoid or mitigate impacts on state-listed species and state species of concern, which shall include but not be limited to measures applicable to the eastern small-footed bat, timber rattlesnake, eastern box turtle, northern cricket frog, long-tailed salamander, and Cobblestone tiger beetle, as well as all other State listed species that may be impacted.  The NJDEP has recommended that PennEast use the State's "Utility Right-of-Way No-Harm Best Management Practices" document while developing these project specific measures. *(Section 4.6.2.28)*

40.  **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of the OEP, a revised Residential Access and Traffic Management Plan which includes the results of traffic counts and an inventory of roadway and intersection geometry, peak hour traffic volume collection, and related observations of traffic operations in the project area. PennEast shall also file any additional site-specific mitigation measures that it will implement to minimize impacts on local traffic in the project area, including any recommendations from state, county, and municipal agencies. *(Section 4.7.1.6)*

41.  **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of the OEP, the following information for residences in close proximity to the project:

   a.   the results of previously unsurveyed areas along the pipeline route and an updated list of residences and commercial structures within 50 feet of the construction right-of-way;

   b.   for all residences identified within 25 feet of a construction work area, a final site-specific construction plan that includes all of the following: a dimensioned site plan that clearly shows the location of the residence in relation to the pipeline, the boundaries of all construction work areas, the distance between the edge of construction work areas and the residence and other permanent structures, and equipment travel lanes;

   c.   a description of how and when landowners will be notified of construction activities;

   d.   documentation of landowner concurrence if a structure within the construction work area will be relocated or purchased;

   e.   documentation of landowner concurrence if the construction work areas will be within 10 feet of a residence; and

   f.   a description of how PennEast will provide temporary housing for residents temporarily displaced during construction and whether PennEast will compensate landowners for this cost. *(Section 4.7.3.1)*

42.  **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of the OEP, a final crossing plan for the Appalachian National Scenic Trail that includes: timing restrictions, closure schedules, and site-specific safety and mitigation measures including signage and barriers if needed; and documentation of consultation with the Pennsylvania Game Commission. *(Section 4.7.5.1)*

43.  **Prior to construction**, PennEast shall file with the Secretary, for review and written approval of the Director of the OEP, plans regarding a gating or boulder access system for the pipeline right-of-way across Pennsylvania state lands, developed in consultation with the Pennsylvania Department of Conservation and

Natural Resources (PADCNR), to prevent unauthorized vehicle access while maintaining pedestrian access. *(Section 4.7.5.2)*

44.     **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of the OEP, additional information on the crossing of the Bethlehem Authority water transmission tunnel crossed at MPs 51.0R2 and 51.6R2.  Additional information shall include, but not be limited to:

   a.     a site-specific crossing plan for each crossing location, including construction methods and measures used to avoid impacts on the water transmission tunnel;

   b.     identification of any blasting that will be required within 2,000 feet of the water tunnel;

   c.     a vibration monitoring program that will be implemented during construction; and

   d.     documentation of working meetings with the Water Authority to ensure that concerns related to construction and operation of the pipeline over the water transmission tunnel are adequately addressed. *(Section 4.7.5.3)*

45.     PennEast shall file with the Secretary reports describing any documented complaints from a homeowner that a homeowner's insurance policy was cancelled, voided, or amended due directly to the grant of the pipeline right-of-way or installation of the pipeline and/or that the premium for the homeowner's insurance increased materially and directly as a result of the grant of the pipeline right-of-way or installation of the pipeline.  The reports shall also identify how PennEast has mitigated the impact.  **During construction**, these reports shall be included in PennEast's **weekly** status reports (see recommendation 8) and in quarterly reports for a **2-year period** following in-service of the project. *(Section 4.8.8.2)*

46.     **Prior to construction**, PennEast shall assess potential project impacts on the Hickory Run Recreation Demonstration Area and file with the Secretary a recommendation of effects and the Pennsylvania State Historic Preservation Office's (SHPO's) comments. *(Section 4.9.2.1)*

47.     **Prior to construction**, PennEast shall file with the Secretary all effects assessments related to historic districts crossed in New Jersey.  PennEast shall also include site avoidance or mitigation plans and documentation of New Jersey SHPO's comments. *(Section 4.9.2.2)*

48.     **Prior to construction**, PennEast shall provide an assessment of potential project effects to Bridge #D-449 Worman Road along with comments of the New Jersey SHPO and any needed avoidance or treatment plans for the resource. *(Section 4.9.2.2)*

49. **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of the OEP, a final vibration monitoring plan for historic properties within 150 feet of the construction workspace in consultation with the Pennsylvania and New Jersey SHPOs. *(Section 4.9.5)*

50. **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of the OEP, a revised Blasting Plan that includes a review of potential effects on cultural resources, including caves, rock shelters, and aboveground historic structures, and how those impacts will be addressed. *(Section 4.9.5)*

51. PennEast **shall not begin construction** of facilities and/or use of all staging, storage, or temporary work areas, and new or to-be-improved access roads **until**:

    a.  PennEast files with the Secretary:
        (i)    remaining cultural resources survey report(s);
        (ii)   site or resource evaluation report(s) and avoidance/treatment plan(s), as required;
        (iii)  the project's recommended effects to historic properties in Pennsylvania and New Jersey; and
        (iv)   comments on the cultural resources reports and plans from the Pennsylvania and New Jersey SHPOs, as appropriate;

    b.  the Advisory Council on Historic Preservation is afforded an opportunity to comment if historic properties will be adversely affected; and

    c.  the FERC staff reviews and the Director of the OEP approves the cultural resources reports and plans, and notifies PennEast in writing that treatment plans/mitigation measures (including archaeological data recovery) may be implemented and/or construction may proceed.

    All materials filed with the Commission containing **location, character, and ownership information** about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering: **"CUI\\PRIV - DO NOT RELEASE."** *(Section 4.9.6)*

52. If changes to the project construction schedule and/or design occur that will materially impact the amount of construction nitrogen oxide ($NO_x$) emissions generated in a calendar year, PennEast shall file with the Secretary, **prior to construction,** revised construction emissions estimates prior to implementing the revised construction schedule and/or design modification demonstrating that the annual $NO_x$ emissions resulting from the revised construction schedule and/or design do not exceed general conformity applicability thresholds.  In addition, if any such project revised construction schedule and/or design changes result in emissions that will exceed the general conformity applicability thresholds, then a draft general conformity determination will need to be prepared at that time, as

required under Section 93.157(d) of the Federal General Conformity regulation at 40 Code of Federal Regulations Part 93, Subpart B. *(Section 4.10.1.3)*

53.  PennEast shall implement the following measures for on-road vehicles and non-road diesel construction equipment used for construction of the project;

   a.  all on-road vehicles and non-road construction equipment operating at, or visiting, a construction site shall comply with the three-minute idling limit, and anti-idling signs shall be posted;

   b.  all non-road diesel construction equipment greater than 100 horsepower used for more than ten days shall have engines that meet the EPA Tier 4 non-road emission standards or the best available control technology that is technologically feasible and verified by EPA or the California Air Resources Board as a diesel emission control strategy; and

   c.  all on-road diesel vehicles used to haul materials or traveling to and from a construction site shall use designated truck routes that are designed to minimize impacts on residential areas and sensitive receptors such as hospitals, schools, daycare facilities, senior citizen housing, and convalescent facilities. *(Section 4.10.1.4)*

54.  **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of the OEP, a HDD noise mitigation plan for each HDD location to reduce the projected noise level attributable to the proposed drilling operations at the 31 noise sensitive areas (NSAs) with the predicted noise levels above 55 decibel A-weighted (dBA) day-night sound level ($L_{dn}$). During drilling operations, PennEast shall implement the approved plan for all HDDs, monitor noise levels, include the noise monitoring results in its **weekly** status reports, and make all reasonable efforts to restrict the noise attributable to the drilling operations to no more than an $L_{dn}$ of 55 dBA at the NSAs. *(Section 4.10.2.3)*

55.  PennEast shall file a noise survey with the Secretary **no later than 60 days after placing the Kidder Compressor Station in service**. If a full load noise condition survey is not possible, PennEast shall provide an interim survey at the maximum horsepower load and provide the full load survey **within six months**. If the noise attributable to the operation of the compressor station at full load exceeds an $L_{dn}$ of 55 dBA at any nearby NSA, PennEast shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within one year of the in-service date.** PennEast shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days after it installs the additional noise controls.** *(Section 4.10.2.3)*

Docket No. CP15-558-000                                             - 98 -

56.     **Prior to construction**, PennEast shall consult with the Federal Aviation
        Administration and the appropriate authority at the Trenton-Mercer Airport
        regarding any requirements or guidelines that need to be followed during
        construction or operation of the project.  Records of these consultations, as well as
        any requirements made by the Federal Aviation Administration and the Trenton-
        Mercer Airport, shall be filed with the Secretary. *(Section 4.11.3)*

Exhibit C

9/28/2017                                    PennEast Incident Report - Entries

Status: **Reviewed**

Entry #:  10

Date Submitted:  1/5/2016 3:00 PM

Landowner                                          Land Agent Name
Bethleham Authority                                Jay Beers

Physical Address of Incident                       Land Agent Phone
Interchange Rd CP-44                               989-878-1663

Township                                           Land Agent Email
Lehighton                                          jbbeers28@gmail.com

County                                             State
Carbon                                             PA

Phone Number (S)

Function
Survey Support

Other PennEast Personal Present
None

Parcel Number(s)
PE-CA-154.000 & PE-CA-155.000

Date
1/5/2016

Time
1:00 PM

Verbal or Physical
Verbal

Length
5 Min.

Individual Causing Incident:
Caucasian Male

Description of Incident and any actions taken: BE SPECIFIC AND DETAILED
I was sitting in my car down the road from the control point. An older light gray Toyota Land Ranger pulled up across the
road from me. This truck was from the early 70's and was in really good condition. The driver was a white male in his 40's
maybe 50, and was the only person in the truck. He also had a pit bull in the back seat. He was yelling at and giving me the
finger. I let him continue for a few minutes before I rolled my window down. He then told me I was trespassing and to fucking
leave now. I told him I was on the public right of way and that I had permission to be there. He then told me he would kick
my ass if I didn't get the fuck out of here. The signs in the area state that we are not wanted! These people didn't want me
on the property and everyone else in the area was not going to be paid off! He put his car in park and then I showed him my
badge ( Badge from being a Fire Officer) and told him I didn't like his threat! Then he said, hide behind your badge, if I was
50 Years younger... I'd still kick your ass! I motioned for him to move along. I tried to get his Pa. license plate number, but he
was to far away. He could see that I was looking for his number. He returned and drove by me a second time a few minutes
later. That is when I drove down the street to the State Police Post and made my report.

Were Authorities Contacted
Yes

**Name of Authority Contacted:**
Pa. State Police

**Description of action taken by authorities: BE SPECIFIC AND DETAILED**
Incident # No4-1306895
Investigator – Cpl. William Gross Badge #7580
Pa State Police Lehighton
610-681-1850

# Exhibit D

9/28/2017                                    PennEast Incident Report - Entries

Status: **Reviewed**

Entry #:  19

Date Submitted:  3/25/2016 11:00 AM

Landowner                                         Land Agent Name
William Markus                                    Vincent D Sherry

Physical Address of Incident                      Land Agent Phone
feather bed road Kingwood Township on the road.   7245998354

Township                                          Land Agent Email
vsherry6@gmail.com                                vsherry6@gmail.com

County                                            State
Luzerne                                           PA

Phone Number (S)

Function

Other PennEast Personal Present
Corr Pro Crew Joe and Zach

Parcel Number(s)
PE-HU-148.000

Date
3/25/2016

Time
12:15 PM

Verbal or Physical
Physical

Length
1 minute

Individual Causing Incident:
William Markus and one other female neighbor.

Description of Incident and any actions taken: BE SPECIFIC AND DETAILED
The Corr Pro crew and I drove to feathered rd and were looking over the power line crossing from the road in vehicle. We were looking for SR-30. A land owner stopped us and asked who we were and what we were doing there. We let him know who we were and he immediately let us know he is the owner to the middle of the street and he would like us to leave. A second land owner showed up and began cursing at us saying if we ever come back she will have guns and police ready. We immediately left the area.

Were Authorities Contacted
No

Name of Authority Contacted:

Description of action taken by authorities: BE SPECIFIC AND DETAILED

9/28/2017                                    PennEast Incident Report - Entries

# Exhibit E

9/28/2017                                 PennEast Incident Report - Entries

                                                                    Status: **Reviewed**

Entry #:  20

Date Submitted:  3/29/2016 2:25 PM

**Landowner**                                    **Land Agent Name**
Camp Gotta Get Away                              Phil Bishop

**Physical Address of Incident**                 **Land Agent Phone**
70 Old Stage Road, Albrightsville, PA 18210      940-372-3851

**Township**                                     **Land Agent Email**
Kidder                                           philip.bishop@westernls.com

**County**                                       **State**
Luzerne                                          PA

**Phone Number (S)**

**Function**
Civil survey

**Other PennEast Personal Present**
Dustin Brown

**Parcel Number(s)**
PE-CA-028.000

**Date**
3/29/2016

**Time**
12:36 PM

**Verbal or Physical**
Verbal

**Length**

**Individual Causing Incident:**
Joseph and Catherine Charles

**Description of Incident and any actions taken: BE SPECIFIC AND DETAILED**

While on survey support at CP 33, Dustin Brown with Mott MacDonald called and said that his survey crew had been approached by a landowner while they were working on the Camp Gotta Get Away property. The landowner claimed that he owned to the center of the township road, that the survey crew was trespassing and asked them to leave. At the time of the incident, Dustin and his crew were working alongside Township Road 516, Old Stage Road, at a point where the Camp property and Mr. Charles' property meet. Dustin and his crew pulled back to further inside the Camp property but left some survey equipment up near the township road while he called me. I drove up from the CP to the Camp property and Dustin explained again what had happened while pointing out where the landowner had approached them. Mr. Charles has built a split rail fence across the existing gas line easement and along the western edge of the Camp property and had told Dustin that the fence line was not indicative of the true property line but Dustin did point out to me a property pin on the outside of the fence line which would refute that claim. When Mr. Charles further claimed that he owned to the center of the township road, Dustin said he asked him if he also maintained the road to which Mr. Charles said he didn't want to get into silly details like that. Dustin and I agreed that where they were working was the Camp property to which we had permission to be on and that they should continue with the survey work. I walked with the crew instead of returning to the CP in case Mr. Charles approached us again. We could see Mr. Charles up near the road in the vicinity of the survey equipment and it appeared that he was removing some of the stakes the crew had put in previously. While the crew continued staking the easement, we saw Mr. Charles and a woman walk through the woods parallel to the gas line easement and up to the split rail fence. They split up and both started taking pictures of us. When I approached the woman (I'm assuming Mrs. Charles) and greeted her, she did not reply, just took my picture and walked away. A few minutes later i noticed a police car pull up on the road to the north end of the Camp property and Mr. Charles speaking with the officer inside the car. The police car came down to the Camp property after a few minutes and Dustin and I approached the officer.after he had gotten out of the car. He introduced himself as Officer Woodside with Kidder Township PD and we introduced ourselves as well. Officer Woodside mentioned that he had gotten the call from dispatch just as he was trying to get some coffee and Dustin asked if he'd actually been able to get the coffee. Officer Woodside said he had and laughed. The officer said he had spoken with Mr. Charles and after hearing the story told him that he would not be able to do anything about the situation as it was a legal matter, not a police matter. Officer Woodside asked if we had permission to be on the property and I said we did. I asked if he wanted to see the paperwork and he asked if it was very lengthy. I assured him it wasn't and showed him a copy of the signed survey permission form for Camp Gotta Get Away on my phone. He examined the document for a moment and asked what else we would be doing in the area. Dustin explained that he needed to go back up to the area along the road to put in some more stakes and asked if that would be a problem. Officer Woodside said it would not be a problem for him but advised that Mr. Charles had already pulled up some of the stakes. He had told Mr. Charles just to leave the stakes along the road so that it wouldn't turn into a theft issue. He knew that survey procedures had been discussed at the township and thought that we had permission to work along the berm of the road but wanted to double check with the township attorney. Officer Woodside asked who our attorney was and I said that PennEast had several attorneys but I could put him in touch with the project manager as a first step. He said that would be fine and we exchanged business cards. Officer Woodside said again that he was not going to do anything about the situation other than filing his report. Dustin and I thanked him for his time and he left the area. We did not see Mr. Charles again after the officer left and Dustin and his crew resumed their work. I stayed with the crew on the property until they got to a stopping point and moved to a different property further south. I returned to the CP and submitted this report.

**Were Authorities Contacted**
Yes

**Name of Authority Contacted:**
Officer Horace Woodside

**Description of action taken by authorities: BE SPECIFIC AND DETAILED**
None. See above.

# Exhibit F

9/28/2017                                    PennEast Incident Report - Entries

Status: **Reviewed**

Entry #:  29

Date Submitted:  4/19/2016 6:52 PM

**Landowner**
Kinney, Lester Sr. & Ruth

**Land Agent Name**
Larry C. Gilbert

**Physical Address of Incident**
380 Milford-Warren Glen ROad

**Land Agent Phone**
479-647-2512

**Township**
Holland

**Land Agent Email**
larry.gilbert@westernls.com

**County**
Hunterdon

**State**
NJ

**Phone Number (S)**

**Function**

**Other PennEast Personal Present**
Rob Piel & Lisa

**Parcel Number(s)**
1015-15-3.01

**Date**
4/19/2016

**Time**
10:30 AM

**Verbal or Physical**
Verbal

**Length**
5 minutes

**Individual Causing Incident:**
Kinney, Lester Jr.

**Description of Incident and any actions taken: BE SPECIFIC AND DETAILED**
We pulled over to the right side of Milford-Warren Glen Rd. to get a GPS reading to make sure the land on the hillside belonged to NJ State DEP. As Rob was getting the GPS reading, a man came walking towards us from the Kinney farm. When he made it to the side of the road, he asked if we were from Penn East and I said yes sir, we are doing some surveying in this area. He said you are not going to do any surveying in this area and the pipeline is not coming thru here. I'll guarantee this and he held up his gun and shook it a couple of times. He never pointed the gun at us but he did shake it at us. He said we have been here for two hundred years and I will not let the line come thru. I said yes sir and got in my truck and left. The guy was wearing a red shirt and brown jeans. He had dark hair.
After I left the incident, I made my call to Patrick McCreary and he had me call Dan Murphy to find out if we should file a police report, which we did. I met Pat at the Holland Police Headquarters and I gave my statement to officer, Michael D. Bent and then left to go to the office and talk to Dan and Peter. Later I was called by Officer Bent to come back to the police station and follow him to the Hunterdon County Prosecutors Office
Officer Michael D. Bent called me at 2:45 PM and asked me to come back for the video statement at the prosecutor's office. Pat McCreary and myself are headed back to Holland Township and then to the Office of the Prosecutor where I did my video statement. Rob and Lisa had to do a video statement, also.

PennEast Incident Report – Entries

**Were Authorities Contacted**
Yes

**Name of Authority Contacted:**
Holland Police Department

**Description of action taken by authorities: BE SPECIFIC AND DETAILED**
They took our statements plus had us go to the Prosecutors Office in Flemington to do a video statement. They said that a decision would be made in a couple days as to what they will charge him with.

# Exhibit G

Status: **Reviewed**

**Entry #:** 55

**Date Submitted:** 7/13/2016 8:01 PM

| | |
|---|---|
| **Landowner**<br>John Tessieri III | **Land Agent Name**<br>Barry Burkhart |
| **Physical Address of Incident**<br>PE-HU-075.000 Driveway and street | **Land Agent Phone**<br>469-343-8950 |
| **Township**<br>Holland | **Land Agent Email**<br>barrymburkhart@gmail.com |
| **County**<br>Hunterdon | **State**<br>NJ |

**Phone Number (S)**

**Function**

**Other PennEast Personal Present**
RJ Defrese, Nick Bono, later - Vincent Sherry

**Parcel Number(s)**
PE-HU-A104.000

**Date**
7/13/2016

**Time**
12:15 PM

**Verbal or Physical**
Physical

**Length**
About 45 min

**Individual Causing Incident:**
John Tessieri III

**Description of Incident and any actions taken: BE SPECIFIC AND DETAILED**
RJ Defrese and crew were dialing in front corners of PE-HU-075.000, Kozak. They noticed a man drive by and pull in across the street. He immediately started taking pictures and videos, but did not specifically interact. He then went inside and brought his Pit Bull out with him. The dog did not ever do anything intimidating. He was making calls on his phone. He came closer to the road where we were. I asked if there was a problem. He just spit whatever was in his mouth in our direction (not close enough to contact). He also enacted a mooning. He went in house, then returned with a sling chair. He sat down across from us as long as we were near the road between Kozak and him. He was playing very offensive rap music loudly. No direct interaction took place, just trying to be intimidating. He did call Holland Police and filed a complaint. Vincent Sherry filled out report on that. No major problems, just nuisance. Video coming later. When guys moved further away from street, he finally went back to his own business and left the premises.

**Name of Authority Contacted:**
Holland Police

**Description of action taken by authorities: BE SPECIFIC AND DETAILED**
Vincent Sherry reported this portion already, but he just said a complaint was filed, but we were fine, and left.
About 15 second interaction.

# Exhibit H

Status: **Reviewed**

**Entry #:** 68

**Date Submitted:** 8/5/2016 6:51 PM

**Landowner**
Michael Loncoski

**Land Agent Name**
John Barenz

**Physical Address of Incident**
My telephone·

**Land Agent Phone**
3036416670

**Township**
Plains

**Land Agent Email**
jbarenz@gmail.com

**County**
Luzerne

**State**
PA

**Phone Number (S)**
(570) 825-7508

**Function**

**Other PennEast Personal Present**
No one

**Parcel Number(s)**
PE-LU-142.000; PE-LU-143.000

**Date**
8/5/2016

**Time**
2:15 PM

**Verbal or Physical**
Verbal

**Length**
1 Minute

**Individual Causing Incident:**
Michael Loncoski

**Description of Incident and any actions taken: BE SPECIFIC AND DETAILED**
At 2:15 PM this afternoon I received a phone call from (570) 825-7508. The man on the phone did not identify himself. He asked me if I was John. I said yes. He said he received another letter from our company and wanted me to know that we haven't received approval yet. He also said, "As our stupid president said last week...we believe in our religion and we believe in our guns." At that, he hung up.

**Were Authorities Contacted**
Yes

**Name of Authority Contacted:**
Sergeant David Abraham

# Exhibit I

Status: **Reviewed**

**Entry #:**  37

**Date Submitted:**  5/24/2016 2:34 PM

**Landowner**
Marcella Hunsicker

**Physical Address of Incident**
9070 Interchange Road Lehighton PA 18235

**Township**
Towamensing

**County**
Carbon

**Phone Number (S)**
610-681-4317

**Function**
Surveying

**Other PennEast Personal Present**
RJ and survey team

**Parcel Number(s)**
PE-CA-156.000

**Date**
5/24/2016

**Time**
2:20 AM

**Verbal or Physical**
Verbal

**Length**
5 Mins

**Individual Causing Incident:**
Unknown

**Land Agent Name**
Philip Michael Stallard

**Land Agent Phone**
5708786220

**Land Agent Email**
philipstallard@yahoo.com

**State**
PA

**Description of Incident and any actions taken: BE SPECIFIC AND DETAILED**
RJ called me and told me that a person mowing a lawn behind the parcel they are surveying drove by on the mower and shot rocks at them (with the mower). RJ said the spot he was at was already mowed before he came over. Said the guy on the mower kept on going and went away.

**Were Authorities Contacted**
No

**Name of Authority Contacted:**

**Description of action taken by authorities: BE SPECIFIC AND DETAILED**

PennEast Incident Report - Entries

# Exhibit J

Protesters arrested as pipeline construction begins on natural gas pipeline in Lancaster County... PennLive.com

## Protesters arrested as pipeline construction begins on natural gas pipeline in Lancaster County

Posted on October 16, 2017 at 3:39 PM

2

3
shares

By **David Wenner**, dwenner@pennlive.com

West Hempfield Township--Protesters surrounded a giant piece of digging machinery and about 25 were arrested as they tried to block the start of construction of a natural gas pipeline near Columbia in Lancaster County.

Within minutes of the last hand-cuffed protester being led away, work on the Atlantic Sunrise pipeline began on the tract of cornfield about a mile south of Route 30.

The arrests took place on farmland owned by the Adorers of the Blood of Christ, a religious order of nuns who are suing the federal agency that approved the project, and Williams Partners LP, the Oklahoma firm that's building the pipeline to transfer natural gas from Pennsylvania's Marcellus Shale region.

Although the suit is still alive, a federal judge on Friday ruled that construction can begin.

On Monday, a crowd of protesters had gathered before 7 a.m. The pipeline, organizers said, violates "our religious rights, community rights, property rights, and rights to clean air and water."

The protesters included people of all ages -- retirees, parents of young children and even a few teens who otherwise would have been in school. It took hours until construction equipment was in position and ready to go. Throughout the morning,

Mark Clatterbuck, one of the leaders of the protest, urged the group to refrain from hostile words and actions. But, framing it as a "moral" dispute between profit-seeking outside interests and local people trying to protect the safety and beauty of their community, he said it would be a good time for those willing to be arrested for the cause to make their stand. The point, he said, was to call attention to the dispute.

Clatterbuck and his wife, Melinda Harnish Clatterbuck, were among those arrested.

The arrested protesters, who had sung hymns and folk songs as they stood with arms locked, will be charged with defiant trespass, a third-degree misdemeanor with a penalty of up to a year in jail. They were handcuffed and taken to a different location to be arraigned. The arrests included one or two juveniles.

As work began just before 2 p.m. on Monday, one protester who served as a liaison with police said he was unsure what protesters will do next. However, Clutterback had earlier urged protesters, including members of a group called Lancaster Against Pipelines, to maintain a vigil at the site.

There was no outright conflict between protesters and the dozens of hard-hatted pipeline workers at the site, or between protesters and police, who were from multiple departments. After giving a warning, police gave the protesters about 30 minutes to leave the pipeline easement. Officers could be seen pleasantly interacting with the protesters as they arrested them one by one, with the protesters who chose to yield rather than be arrested cheering and calling out the name of each one who led away.

Brett Hambright, a spokesman for the Lancaster District Attorney's Office, said the protesters were "very peaceful, very cooperative and very respectful, and the police wanted to reciprocate to them as well."

ADVERTISING

The 42-inch pipeline will be buried about three feet underground. In Lancaster County, it will also be laid under natural features including the Conestoga River.

Williams on Monday put out a written statement which read, "We respect the rights of people to protest, but our focus is on constructing this important, federally approved infrastructure in a safe, efficient manner. We will continue to coordinate with local and state authorities to ensure protestors, construction personnel and our employees are protected during the construction process."

"We are committed to treating all landowners fairly and with respect. It is important to note that the Adorers property, which until recently has been used for farming, will continue to be able to be used for farming once the pipeline is installed."

While the Adorers of the Blood of Christ oppose the pipeline, and owner of the adjoining farmland has agreed to allow it.

Registration on or use of this site constitutes acceptance of our **User Agreement** and **Privacy Policy**

© 2017 PA Media Group. All rights reserved (**About Us**).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of PA Media Group.

**Community Rules** apply to all content you upload or otherwise submit to this site.

▷ **Ad Choices**

# Exhibit K

Case 3:18-cv-01585-BRM-DEA   Document 1-6   Filed 02/06/18   Page 68 of 88 PageID: 286



**☰  ⌂  LANCASTER AGAINST PIPELINES**

*Home  / Support LAP*

# PLEDGE TO RESIST

Because our state and federal government, our legislators, and our courts have all failed to protect our homes or prevent the endangerment of our lives and land--even after we have followed all available procedures in order to stop this pipeline--we have been given no choice but to resist the unchecked, belligerent aggressions of Williams Companies with *nonviolent* direct mass action.

And we need your help.



611 PLEDGES
**1,000 PLEDGES**

# <u>WE STAND WITH THE LAND</u>

## *PREAMBLE:*

We, as **local communities**, have an **inherent right**—and **duty**—to [1] **protect the land, water, and air** that give us life, and [2] **ensure the health and safety of our residents**.

**For three years, we've opposed Williams's plans** to run a dangerous, fracked gas, export pipeline through the heart of our communities, using every legal means available to us. **Yet our system of government, at all levels, has failed to protect us**. As 2017 begins, **our resolve is stronger than ever to protect ourselves and this land by ensuring the Atlantic Sunrise Project never gets built.**

## *TOGETHER:*

• **We defy a system of government** that tells us we can't protect ourselves from industrial harms because corporations have been given more "rights" than we who live here.

• **We defy the gas industry's plans** to subject our families, communities, and natural environment to catastrophic danger for their own corporate profit.

• **We defy FERC's conclusion** that the Atlantic Sunrise Project would have "less-than-significant" impacts on our land, water, and communities.

## *TOGETHER:*

• We pledge to protect our **water**.

• We pledge to protect our **preserved farms**.

• We pledge to protect our **forests** and precious **wildlife**.

• We pledge to protect our **sacred Native American heritage** and culture.

• We pledge to protect our **Amish neighbors** who've been targeted and harassed.

• We pledge to protect the **future of our children**, who must live with the consequences of the actions—or inaction—we take today.

### *WITH THIS PLEDGE:*

We vow to protect our communities through **nonviolent Civil Disobedience** if FERC gives Williams Gas Company permission to poison our water, clear-cut our forests, steal our farms, bulldoze our Native heritage, and put our families at risk. Along with our financial and material resources, we pledge to put our bodies between the land we love and those seeking to destroy it.

### *TOGETHER, WE STAND WITH THE LAND.*

## WILL YOU SIGN?

*First Name*

*Last Name*

*Email*

*Mobile phone*

☑ *Send me email updates*

☑ *Send me text message updates*

*Phone*

☐ *I want to volunteer*

ADD PLEDGE

Case 3:18-cv-01585-BRM-DEA   Document 1-6   Filed 02/06/18   Page 71 of 88 PageID: 289

🏷 Pledgetoresist2017

SIGN UP FOR EMAIL HERE   *Email address*   JOIN   

CREATED WITH **NATIONBUILDER**

# Exhibit L

Sign Up

Email or Phone          Password
                                              Log In
                        Forgot account?



SEP
23   Non-Violent Mass Action Training
     Public · Hosted by Lancaster Against Pipelines

Interested

September 23 – September 24
Sep 23 at 10:00 AM to Sep 24 at 3:00 PM EDT

Climbers Run Nature Preserve                    Show Map

        About                        Discussion

**32 Went · 106 Interested**
Share this event with your friends

### Details

This will likely be our last training before construction begins.
(Come for a day, or both- Stay the night and Camp with us!)

Will you provide support to those demonstrating nonviolent resistance to this
destructive pipeline?

Are you willing to deliver food and water, take photos or videos during
actions, sing songs or paint banners, join our team of field medics or serve
as a legal observer?

Will you stand arm in arm with neighbors to protect our water and homes?
Are you willing to risk arrest?

Come ask questions and acquire all the skills you need to do what our
government and courts have refused to do: protect our communities and
environment from greedy billionaires.

Health    Free Admission    Kid Friendly

### About Lancaster Against Pipelines



**Lancaster Against Pipelines**
Community
Lancaster Against Pipelines is a grass roots coalition of county
residents opposing the Atlantic Sunrise Project. They are land
protectors.

### About the Venue

**Climbers Run Nature Preserve**

# Exhibit M

Case 3:18-cv-01585-BRM-DEA    Document 1-6    Filed 02/06/18    Page 75 of 88 PageID: 293

≡ ⌂ **LANCASTER AGAINST PIPELINES**

*Home  / Donate*

# LAP LEGAL DEFENSE FUND

We might need bail. Donate to the LAP Legal Defense Fund here.



Over the years, we've hoped for the best but planned for the necessary. Now, the only thing standing between the safety of our homes and families is us. But we're standing together. And we need your help should we require legal support, training, representation... and bail money.

Not everyone is willing or able to risk arrest--and there are so many other ways to support this movement!--but we hope you'll support those who are.

Donate to the LAP Legal Defense Fund here.

SIGN UP FOR EMAIL HERE    *Email address*    JOIN    

CREATED WITH NATIONBUILDER

# Exhibit N



# N.D. pipeline fight a blueprint for more protests

**BLAKE NICHOLSON, The Associated Press**      Published 8:14 p.m. ET April 2, 2017



*(Photo: Amy Newman / AP)*

BISMARCK, N.D. — Prolonged protests in North Dakota have failed to stop the flow of oil through the Dakota Access pipeline, at least for now, but they have provided inspiration and a blueprint for protests against pipelines in other states.

The months of demonstrations that sought to halt the four-state pipeline have largely died off with the February clearing of the main protest camp and the completion of the pipeline, which will soon be moving oil from North Dakota to a distribution point in Illinois.

Four Sioux tribes are still suing to try to halt the project, which they say threatens their water supply, cultural sites and religious rights. But they've faced a string of setbacks in court since President Donald Trump moved into the White House.

Despite the setbacks, Dakota Access protest organizers don't view their efforts as wasted. They say the protests helped raise awareness nationwide about their broader push for cleaner energy and greater respect for the rights of indigenous people.

"The opportunity to build awareness started at Standing Rock and it's spreading out to other areas of the United States," said Dave Archambault, the chairman of the Standing Rock Sioux tribe, which has led the legal push to shut down the pipeline project.

As protesters left the area in southern North Dakota where the Dakota Access pipeline crosses under a Missouri River reservoir that serves as the tribes' water supply, organizers called on them to take the fight to other parts of the country where pipelines are in the works.

The tactics used in North Dakota — resistance camps, prominent use of social media, online fundraising — are now being used against several projects. They include the Sabal Trail pipeline that will move natural gas from Alabama to Florida; the Trans-Pecos natural gas pipeline in Texas; the Diamond pipeline that will carry oil from Oklahoma to Tennessee; and the Atlantic Sunrise pipeline that will move natural gas from Pennsylvania to Virginia.

They're also being used against projects that are still in the planning stages, including the proposed Pilgrim oil pipeline in New York and New Jersey and the proposed Bayou Bridge Pipeline in Louisiana.

Dakota Access opponents have also vowed to fight against the resurgent Keystone XL pipeline, which would move crude oil from Canada to Nebraska and on to Texas Gulf Coast refineries.

"A big part of our message was not just to nationalize the fight against Dakota Access, but to highlight regional issues that people are facing," said Dallas Goldtooth, an organizer with the Indigenous Environmental Network. "To use our momentum."

The influence of the Dakota Access protest is evident in various forms. For example, some who protested in North Dakota have gone to Texas and Florida to help with those demonstrations, according to Goldtooth. The Red Warrior Society, a pipeline protest group that advocated aggressive tactics in North Dakota, is promoting resistance in other states via social media.

There are nearly a dozen accounts on the GoFundMe crowdfunding site seeking money to battle the Sabal Trail and Trans-Pecos pipelines. The Society of Native Nations, which is fighting the Trans-Pecos, used the protest camp model from North Dakota to set up a camp in Texas, according to Executive Director Frankie Orona.

"I really believe this momentum is going to stay alive," said Orona. "Standing Rock was the focal point, was the root of this movement. If we learned anything from Standing Rock, it's the power of unity. It wasn't one (tribal) nation — it was more than 400."

Hundreds, and sometimes thousands, of Dakota Access opponents congregated at the main protest camp for half a year, often clashing with police to draw attention to their cause. More than 750 people were arrested between early August and late February, when the camp was closed in advance of spring flooding season.

The prolonged protest garnered widespread and consistent attention on social media, and it has filtered down, to some degree, to the pipeline protests elsewhere. That has elevated activists' concerns from local demonstrations to a national stage, according to Brian Hosmer, an associate professor of Western American history at the University of Tulsa.

"Social media makes it more difficult to shut off the camera," he said. "In some way, they're their own reporters and they don't need the networks to report it. Social media connects the tribe; it now connects all of these separate groups."

For now, the energy industry and its allies say they're unconcerned.

The Dakota Access movement wrote the new playbook for pipeline opponents, but it might be less effective under Trump, said Craig Stevens, spokesman for the MAIN Coalition, a group of agriculture, business and labor entities that long spoke in favor of the pipeline. Trump approved its completion shortly after taking office and he has taken other steps favorable to the fossil fuel industry while rolling back Obama-era environmental protections.

U.S. Rep. Kevin Cramer, a North Dakota Republican who has advised Trump on energy issues, said pipeline developers have learned to prepare for resistance, and he thinks the anti-pipeline movement will fade if protesters fail to achieve their goals and get discouraged.

Juliana Schwartz, senior campaigner for Change.org, which helps people and groups advance causes, disagrees, saying the environmental protest movement appears to be strong. A "people against pipelines" page on the group's website recently listed 16 petitions related to energy projects — mostly pipelines — in more than half a dozen states, with nearly 725,000 supporters.

"The broader movement to stop resource extraction has taken inspiration from (Dakota Access)," Schwartz said. "I think we can expect to see this trend continue as more and more communities feel that their safety and health is under threat due to the president's support of the fossil fuel industry over marginalized communities."

_____

Contributing to this story were Associated Press writers Justin Juozapavicius in Tulsa, Oklahoma; David Warren in Dallas; Dave Kolpack in Fargo, North Dakota; and Ken Miller in Oklahoma City.

_____

Follow Blake Nicholson on Twitter at: https://twitter.com.NicholsonBlake

*Copyright 2017 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*

Read or Share this story: http://www.yorkdispatch.com/story/money/business/2017/04/02/nd-pipeline-fight-blueprint-protests/99964344/

# Exhibit O

Tap here to turn on desktop notifications to get the news sent straight to you.                    ✕

≡                                                               *US*
                                                                                                    EDITION



... A GREAT VEHICLE,
PERIOD.                                                                          CHEVROLET

                                                                                 AdChoices ▷

 **Wild River Review** - Joy E. Stocke, Contributor
Connecting People, Places and Ideas: Story by Story

# PennEast Pipeline Protestors Gather With Sioux At Standing Rock

"Tell your people to stop the Black Snake. Tell them they cannot back down."

10/27/2016 06:19 pm ET | Updated Oct 28, 2016



PHOTO BY DEBORAH SCOBLIONKOV

Protesters gather in Standing Rock, ND. at trench to protest the construction of the Dakota Access Pipeline.

**by Deborah Scoblionkov**

Oceti Sakowin Camp, Standing Rock, ND.

Monday morning October 10, 2016,

"WAKE UP WARRIORS!" blared the loudspeaker through the frigid morning calm. "Last night the injunction was lifted! The time has come for action. This is what we are here for. Meet at the south gate. We. Must. Kill. The. Black. Snake."

On the morning of October 10, 2016 (Indigenous Peoples Day here, formerly known as Columbus Day), my friend Carla and I are awoken by the commotion and the call to join hundreds of campers in a caravan to the Dakota Access Pipeline (DAPL) construction site in the town of St. Anthony – the front line of the battle against Energy Transfer Partners' 1170 mile, 30-inch diameter pipeline that would cross the Missouri River and connect the rapidly expanding Bakken and Three Forks production areas in North Dakota to Patoka, Illinois. In the process the Dakota Access Pipeline will desecrate traditional sacred lands of the Standing Rock Sioux tribe and threaten the region's water supply.

My friend Carla and I have come from our rural community in New Jersey on the banks of the Delaware River looking for some inspiration. For more than two years, we've been fighting the PennEast pipeline, a 118 mile 36-inch pipeline originating in the Marcellus Shale which will cut through some of the most historic, bucolic, pristine, preserved farmland on the East Coast. There are

Tap here to turn on desktop notifications to get the news sent straight to you.

Our fight to protect the Delaware River Valley from the PennEast Pipeline has involved opposition, on many levels: individual, community groups, environmental groups, expert reports, attorneys, etc. Our participation in the public consultation process with the Federal Energy Regulatory Commission has been frustrated by a lack of consideration as our involvement has been met with adversarial posturing. When we learned about the situation in Standing Rock, we felt compelled to show our solidarity with their struggle and learn from their peaceful, non-violent methods of civil disobedience.

The Oceti Sakowin camp is one of three activist settlements located along the Cannon Ball River about 30 miles south of Bismarck. It is the largest and most diverse, home to an assortment of Native Americans, activists and international visitors who have converged in support of the NODAPL cause.

The main gate opens to the Avenue of Flags, a wide dirt lane lined with hundreds of flags representing tribes all over North America who have come to Standing Rock to show their support. At its height, over Labor Day weekend, the camp had swelled to thousands, the largest gathering of Native Americans ever.

"This event has changed everything," declares Lew Hastings, founder of the Native Now Foundation, whose family lives in Standing Rock. "There is no comparison in history to compare with what has happened in Standing Rock. When 300 out of 570 Native American tribes stand in solidarity – nations who've been enemies for centuries standing together – well, this has not happened in recorded history. And no matter what happens, nothing can ever go back to how things were before."

That weekend in early September culminated in a series of events – the arrival of armed National Guard soldiers to enforce "security", the brazen bulldozing of native American sacred sites, the independent news channel, Democracy Now's video of private security forces using guard dogs to attack peaceful demonstrators; a pair of conflicting court decisions, including the temporary injunction to halt pipeline construction near sacred lands that catapulted the relatively obscure DAPL into an international cause célèbre.

Now, in mid-October, Standing Rock camp populations have shrunk. With the cold weather setting in, supporters are returning home. Efforts to build more permanent structures to house those who hope to stay through the winter are underway. Sturdy teepees are replacing the flimsy canvas tents that dot the camp, which will allow dwellers to cook and heat with open fire.



PHOTO BY DEBORAH SCOBLIONKOV
Tent City

The timing of the judge's decision to lift the injunction – allowing pipeline construction near ancient tribal lands to begin again – was especially poignant. It was the Sunday night before the national holiday celebrating Christopher Columbus.

Carla and I rouse our camp neighbor Bea, start up our minivan and cross the prairie to the "action" site. The land has already been cleared, and pipeline segments are lined up for burial. As we approach, the shadows and pipes do resemble a black snake winding across the landscape.

A young Native American named Olive from Appalachia asks to ride with us. She arrived at camp three weeks ago and is here "to stop the ecocide," she says, "the self-sabotage of our race." Like many with Indian blood in their veins, her family had "white washed" themselves and she spent many years researching her native ancestors and reclaiming her indigenous heritage. She hopes that by stopping this pipeline, it will inspire others and have a ripple effect throughout the world.

Tap here to turn on desktop notifications to get the news sent straight to you.

compulsion It was like the tower in the movie "Close Encounters of the Third Kind," *I have to go there . . ."*

In August, she hitched her camper to her old Subaru Outback and drove with her dog, Suzie, to Standing Rock. She set up camp with a small stove, cooler and bought solar panels to generate electricity to keep computers and cell phones charged.

On September 28, as Bea sat on the side of (what she thought was a public) road observing an "action" where police pulled guns on peaceful demonstrators, she was arrested and charged with criminal trespassing. Her dog was taken to the pound, the car was impounded and she spent the night in jail. Her court date is December 20, and she plans to stay to plead "not guilty."

In the camp, young Native Americans treat Bea with the reverence reserved for elders, watching out for her, checking in on her throughout the day, and serving plates of food to her before the younger folk can eat. She has attended many "actions", but her arrest has earned her special respect among the Standing Rock community.

The Columbus Day call to action seems particularly urgent, and when we arrive at the construction site, a contingent of Native Americans have already set up wooden teepee lodge poles in the pipeline right-of-way zone. On "private" property.

Under the poles, in a circle, are more than a dozen activists sitting in prayer. In front of them are approximately 100 self-declared "water protectors" standing defiantly, holding banners and waving flags. On the sidelines, are more than 100 others chanting, "*Mni Miconi* ("Water is Life") and singing their support for the warriors ("Black Snake Killers!"), urging them to be strong.

The message "water is life," resonates with us. In the river towns along the Delaware River in Pennsylvania and New Jersey south of the Marcellus The PennEast pipeline would cross 255 waterways, including the Susquehanna and Delaware rivers; dozens of pristine C1 streams; and would impact crucial aquifers that provide drinking water to 1.5 million people. And because of the unique geological composition of the land in western New Jersey, construction of the pipeline would release arsenic into people's wells. We too are fighting to protect our water supply and all of the insects, birds, and animals who rely on clean water for life.



PHOTO BY DEBORAH SCOBLIONKOV

Protesters and Police

## Subscribe to the Politics email

How will Trump's administration impact you?

address@email.com                    SUBSCRIBE

Eventually, dozens of law enforcement officers swoop down and arrest a few of the perceived leaders, and position themselves in formation between the teepee and those who refuse to retreat to the protection of the public roadway.

The standoff lasts two and a half hours. The main message is clear "Protect our water. Respect our land. Honor our treaties." But many chants are directed at the police: "As you protect the corporations, we will protect the children . . . the land . . . the water . . . you." Prayers are delivered. Drums are beaten. Dances performed.

⬚ Tap here to turn on desktop notifications to get the news sent straight to you.

130 since the struggle began). But the warriors vow to return . . . to kill the Black Snake.

The Prophecy of the Black Snake (Zuzeca Sape) has many variations. Native American elders from many tribes have predicted that one day the big Black Snake will appear across their land bringing destruction and ruin to the people and the earth. For some, it signals the end of the world. Others believe that snake will unite all nations as one, but the only way is to slay the Zuzeca Sape and cut off its head.

**A Fortuitous Meeting**

I first met Carla in front of a banquet hall along an isolated county road in New Jersey, where we were protesting the PennEast pipeline. Inside, impacted property owners were being served lunch and subjected to a presentation by the pipeline's public relations staff extolling the many benefits of the pipeline. Carla had received an invitation to the luncheon.

Why wasn't she inside? I wondered aloud.

"I can't handle that crap," she replied. "It just makes me want to vomit."

I liked Carla immediately, and knew exactly what she meant.

For Carla, me, and many others in our community, our struggle is linked to the Standing Rock protest.

"All around the Delaware River water shed is evidence of indigenous existence. Lenape Indians lived in and around the river valley," explains Lew Hastings. "But since the Native Americans were driven from their land, and as theirs was an oral tradition, nothing was written down. Consequently, the only way to verify the remains of Native American settlements would be to dig them up."

That evening, back at the camp at Standing Rock, the assembled camp dwellers will feast on moose, elk, deer and buffalo, as well as tomato soup, rice and beans and traditional fry bread. The food is prepared and served in large khaki green tents by volunteers. Chairs are makeshift -- scattered among the cinder blocks, milk crates and five-gallon tubs are fold out chairs. Many sit on the ground.

Food donations have poured into the camp; a large storage tent is full and overflow supplies are stacked high on palettes: tons of flour, beans, grains, canned goods, fresh produce, condiments, etc. On Monday afternoon a large tractor trailer of $15,000 worth of food donated by Fry's Food Stores. With no equipment or skid steer to off-load the goods, passers-by volunteered in to manually unload and stack the packages.

Kei Kurimoto, a former Philadelphia restaurateur who was searching for spiritual fulfillment when she heard the call for Standing Rock, runs the kitchen. She and a group of seven women — the Sacred Feminists for Revolution — caravanned across the country. Many of her friends returned to the East Coast, while she took over the Big Camp's kitchen. She feels comfortable in the matriarchal culture and plans to stay. "No way I'm going back to Philly."

The BBQ pit master is Richard Fisher from South Dakota. "I pretty much was born to be here." His mother was a Sioux Indian activist, his father, a Black Panther. He left a "good paying job" to follow the call and move to Standing Rock. "For some reason it seemed I had to be here." He relishes his work firing up the smoker and cooking the meat. "I know my role here -- to stay behind with the women and children, to feed and protect them."

Other denizens are warriors who've come prepared to give up their lives for the cause. Roger Fontana, a retired truck driver and seasoned Native American Movement activist from the Oglala Lakota tribe ("Crazy Horse's people") in Champlain, IL, believes that the DAPL will be stopped but that he may not live to see it. He arrived on August 30, after the National Guard was activated to enforce "security" on the pipeline construction site and traffic points. "It was like a siege. I came here to die," he says impassively.

As Fontana describes, "we thought that they were getting ready to roll in and wipe us out, or starve us our like at Wounded Knee. We were convinced that it was going to be an invasion — but we won."

"We had a big celebration after September 9th, and the elders got a chance to rest," says Fontana. "And then came the tourists," he adds with a good-natured laugh.

Since then, thousands of non-natives from all over the world have descended on Standing Rock to show their support, most are passing through like Carla and me. In our two days there, we spot license plates from dozens of states; we met a Swedish photojournalist, a Brazilian photographer living in London who received a grant to photograph the camps, an Icelandic musician and indigenous people from across the continent.

Tap here to turn on desktop notifications to get the news sent straight to you.

land."

**The Prophecy of the Black Snake**

Later that night I stop by the Health and Wellness tent for some tea to calm my throat. There, I meet Uma Wilkinson, a Lakota from the Cheyenne River Reservation. She and her husband have been visiting on off and on since the uprising began in the spring.

"This is not just a political, environmental or native rights issue, it's also an international social issue, it's human rights issue. We all have a right to water. Why allow a few to make these decisions for us all?"

As for the Prophecy of the Black Snake, Uma Wilkenson relates a story about her husband's grandmother who nearly died from the West Nile Virus last year. As she slipped in and out of consciousness, she claimed to have passed over to the spiritual realm and met Crazy Horse who swept his arm across the landscape and in the distance she saw oils rigs on the land and fires flaring in the skies that scorched earth and killed the birds.

He asked her to bring a message back to her people:

"Tell your people to stop the Black Snake. Tell them they cannot back down."



PHOTO BY DEBORAH SCOBLIONKOV

**Deborah Scoblionkov is a freelance journalist. She lives on a farm near the Delaware River.**

**To find out more about Wild River Review, click here:** Wild River Review

**RELATED...**

Dakota Access Pipeline Standoff Lapses Into Violence

Dakota Access Pipeline Exposes Rift In Organized Labor

Jill Stein Charged Over North Dakota Pipeline Protest

*Do you have information you want to share with HuffPost? Here's how.*

**ALSO ON HUFFPOST**

# Exhibit P

Dan H Mackey
Carla Kelly-Mackey
60 Sanford Rd
Stockton NJ 08559

January 2, 2017

Daniel F Murphy
PennEast Pipeline Company
1510 Valley Center Parkway, Ste 160
Bethlehem PA 18017

Dear Mr Murphy:

We are in receipt of your latest letter, in which PennEast once again requests permission to access our property. I'm not certain whether you're being intentionally obtuse or you haven't kept up with submissions to the docket by landowners, but we have made our position very clear. In case you missed my two latest comments to FERC, they were submitted on Dec 4, 2016 & posted to the docket on Dec 5. Our response to either your financial offers, or the implications voiced by Barry Burkhart on our answering machine, in which he suggests that our property could be found to be unsuitable for your pipeline if we only allow you access, is no. No, you are not allowed on our property. No, we are not interested in any meetings with you or any of your land agents. No, there isn't a convenient time during which you might survey. No, we don't have any questions or concerns to which we would be willing to listen to your responses. No, we won't consider your requests.

Now I would like you to consider our requests. Stop harassing us with your phone calls & letters. Understand that we will not willingly allow you on our property for any reason. If FERC approves this unneeded destruction to the environment, we will continue to do everything in our power to oppose your project. In October of 2016, I went to North Dakota to join the water protectors in the Standing Rock opposition to the DAPL. If this pipeline is allowed to move forward, we will welcome all who want to journey to our farm & teepees will be constructed along the intended route of your destruction. There is nothing that we will do to enable your project to run

smoothly; we are not friends or supporters of your desire to rape our land.

In closing, I hope that I have made myself clear & you are not under any misconceptions about our lack of willingness to work with you.  Our original & consistent communication denying you or your employees or sub-contractors access to our property remains in effect.

Sincerely,


Carla Kelly-Mackey

Dan H Mackey